UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CHRISTY RENEE CLICK | ) | CASE NO.  1:13CV943 |
| | ) | |
| Plaintiff | ) | MAGISTRATE JUDGE |
| | ) | GEORGE J. LIMBERT |
| v. | ) | |
| | ) | **MEMORANDUM AND OPINION** |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff requests judicial review of the final decision of the Commissioner of Social Security denying Christy Renee Click Disability Insurance Benefits (DIB).  The Plaintiff asserts that the Administrative Law Judge (ALJ) erred in his September 13, 2012 decision in finding that Plaintiff was not disabled because she could perform light work existing in significant numbers in the national economy (Tr. 17, 23-25).  The Court finds that substantial evidence supports the ALJ's decision for the following reasons:

I.      **PROCEDURAL HISTORY**

Plaintiff, Christy Renee Click, filed her application for DIB on March 15, 2011, alleging she became disabled on November 17, 2010 on the basis of affective/mood disorder, osteoarthritis, and allied disorders (Tr. 70-71, 85).  Plaintiff's application was denied initially and on reconsideration (Tr. 84, 111, 121).  Plaintiff requested a hearing before an ALJ, and, on August 30, 2012, a hearing was

1

held where Plaintiff appeared with counsel and testified before an ALJ, and a vocational expert also testified (Tr. 31).

On September 13, 2012, the ALJ issued his decision, finding Plaintiff not to be disabled (Tr. 17, 23-25). Plaintiff requested a review before the Appeals Council, and the Appeals Council denied Plaintiff's request for review (Tr. 5-7). Therefore, Plaintiff has requested judicial review of the Commissioner's final decision pursuant to 42 U.S.C. Sections 405(g).

II.    **STATEMENT OF FACTS**

Plaintiff was fifty-one years old as of the date of the ALJ's decision (Tr. 162). She has her G.E.D. and has completed one semester of college (Tr. 201, 364). During the relevant period, Plaintiff could cook and garden, and she drove, shopped, read (newspapers, magazines, and books), washed dishes, did laundry, swept, and vacuumed (Tr. 37-38, 209-10, 367). She cared for her young grandsons for several hours each day, and she attended their T-ball games (Tr. 208, 211). She went outside daily, ate at restaurants, and could answer the door and telephone (Tr. 210-211, 365). Plaintiff also received unemployment benefits during the relevant period (Tr. 39, 567).

III.    **SUMMARY OF MEDICAL EVIDENCE**

Plaintiff was involved in a motor vehicle accident in 1978, injuring her leg and the right side of her face and forehead (Tr. 221, 593). She underwent multiple surgeries thereafter, including an open reduction internal fixation right femur fracture, with subsequent removal of a rod; as well as other surgeries to her sinuses, right foot, and ankle (Tr. 289, 593). She also underwent physical therapy, after which she was able to recuperate and walk (Tr. 289). Plaintiff was later diagnosed with

2

osteoarthritis in her right thumb, as well as bursitis and colitis (Tr. 285, 289, 293).  Her care providers used cortisone shots and Lipoderm patches to address pain in her hips (Tr. 283-284).  In June 2008, x-rays of Plaintiff's pelvis, hips, and sacroiliac joints revealed no acute processes or abnormalities (Tr. 442-444).  In May 2009, after Plaintiff complained of headaches and swelling, Subinoy Das, M.D. performed, without any complications, an endoscopic sinus surgery with a frontal sinusotomy (Tr. 305, 484).

On October 13, 2009, Plaintiff saw Kerry Hart Heckman, CNP, regarding ongoing cold symptoms; Ms. Heckman found Plaintiff's musculature normal, with no skeletal tenderness or joint deformity (Tr. 318-319).  Several months later, Plaintiff reported to Ms. Heckman that she was "feeling good" (Tr. 315).  Her cold symptoms returned the following year, whereupon Plaintiff complained of a sore throat, with a cough, ear pain, neck soreness, and achiness (Tr. 520).  Ms. Heckman wrote a letter to Plaintiff's employer, dated October 12, 2010, in which she stated that Plaintiff was under her medical care and could return to work on October 14, 2010 (Tr. 539).  Ms. Heckman, thereafter, wrote a follow-up letter, dated October 19, 2010, in which she asked for Plaintiff to be excused from work for an additional two days (Tr. 538).  The following week, Plaintiff returned to Ms. Heckman, complaining of anxiety (for which she was taking Cymbalta, an antidepressant), and symptoms consistent with gastroesophageal reflux disease (GERD), including epigastric pain, and heartburn (Tr. 313).   Ms. Heckman indicated that Plaintiff should take Lorazepam in addition to Cymbalta, as well as Omeprazole (a medication to reduce excess stomach acid) for Plaintiff's GERD symptoms (Tr. 314).

Approximately two weeks after her AOD, Plaintiff presented for a medication refill (Tr. 515).  She stated that she had coughed up bloody mucus the previous day, but she denied, among other things, neurological, musculoskeletal, or psychiatric complaints (Tr. 515).   Her care provider

3

diagnosed her with chronic sinusitis and degenerative joint disease, and instructed her to return in three months (Tr. 515).

Several months later, Plaintiff sent a letter to a "Dr. Kerry" (Kerry Hart Hackman, CNP), who had treated her in the past (Tr. 567).  Plaintiff noted that she had begun receiving unemployment benefits in October 2010, but her former employer was not contesting the claim (Tr. 567).  Plaintiff recounted, when she had been recuperating the previous autumn from strep throat, her care provider had written her a note, saying she could work eight-hour, but not sixteen-hour, shifts at work (Tr. 41, 567).  Plaintiff stated that she had been fired because her supervisor insisted that she work a sixteen-hour shift, but the note stated that she could work only eight-hour shifts at one time (Tr. 567). However, in the interim, she lost the care provider's note, and was seeking another copy of it (Tr. 567).

On March 31, 2011, Plaintiff returned to Ms. Hackman, describing arthritic-type pain and anxiety (Tr. 570).  She stated that she could not afford additional steroid injections or Lipoderm patches (Tr. 570).  She denied ongoing cough, dyspnea, or wheezing symptoms (Tr. 571). Ms. Heckman recommended Ultram for Plaintiff's complaints of pain, and that Plaintiff undergo tests the following month (Tr. 572).

About three months later, Don McIntire, Ph.D. conducted a consultative review of Plaintiff (Tr. 363). Plaintiff drove herself to the appointment, and reported that, while she had experienced intermittent anxiety symptoms from and after her teenage years, she had not been in therapy or seen a psychiatrist, except for a period of counseling following her motor vehicle accident several decades earlier (Tr. 363, 368).  She reported having been fired from her last job, after arguing with her supervisor (Tr. 364).  Dr. McIntire found Plaintiff mildly depressed (Tr. 365-366).  He determined that Plaintiff had impaired short-term memory, with somewhat limited judgment, but her long-term

4

memory was unimpaired, and she was functioning intellectually within the low-average range (Tr. 367). Dr. McIntire found her greatest functional difficulty was with interactions with supervisors and coworkers, with at least a mildly impaired ability to cope with the typical stresses of everyday worklife (Tr. 72, 369). Dr. McIntire further opined that Plaintiff's ability to understand and remember simple instructions and maintain concentration for simple tasks was unimpaired (Tr. 72, 367, 369). He assigned her a Global Assessment of Functioning (GAF) score of 53, indicating moderate symptoms (Tr. 368).

Several weeks later, state agency physician Ermias Seleshi, M.D. reviewed the record and opined that Plaintiff experienced a mild restriction in her activities of daily living, with moderate difficulties in maintaining social functioning, concentration, persistence, or pace (Tr. 76). Dr. Seleshi also opined that Plaintiff had moderately limited abilities to carry out detailed instructions, maintain attention and concentration for extended periods, work in coordination with or proximity to others without distraction, complete a normal workday and workweek without requiring unreasonable rest periods, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, respond appropriately to changes in the work setting, and set realistic goals or make plans independently of others (Tr. 79-80). Dr. Seleshi opined that Plaintiff's mental impairments limited her to brief, intermittent, and superficial interactions with the general public, coworkers, and supervisors (Tr. 80). Dr. Seleshi concluded that Plaintiff would function optimally in a stable work environment with predictable routines and procedures, with changes explained in advance (Tr. 81).

The following month, Orin Hall, M.D., MPH, MBA, CIME found Plaintiff's cervical spine not to be tender, with a normal range of motion and no evidence of nerve root damage (Tr. 378, 380). Also, Plaintiff's hips and shoulders exhibited a normal range of motion (Tr. 378-379). Dr. Hall found

5

that Plaintiff experienced a diminished range of motion in her dorsolumbar spine, but it also was not tender (Tr. 378). Dr. Hall noted that, while Plaintiff experienced diminished range of motion in knees, and she walked with an antalgic gait, she did not require an ambulatory aid, and her lungs were clear to auscultation with no wheezes or rhales (Tr. 378). Plaintiff exhibited 5/5 muscle strength in her upper and lower extremities, with no evidence of atrophy, and she could make a fist, and write, button, and pick up coins without difficulty (Tr. 379). Dr. Hall also found no motor, sensory, or reflex abnormalities in her upper extremities (Tr. 380). Dr. Hall diagnosed her with chronic multiple joint pain, and he opined that she should be limited to light work; she might have difficulty walking more than three hundred feet, standing for more than a half hour, or sitting for more than one hour at a time; but her handling of objects was normal (Tr. 380). X-rays of Plaintiff's left lower leg that were taken the same day showed no acute or suspicious abnormality (Tr. 371, 379). An x-ray of her hip joint was also normal-appearing, with a suspected healed traumatic deformity or fracture (Tr. 373, 379).

Plaintiff returned to Ms. Heckman several weeks later, reporting that she had not undergone the tests requested by Ms. Heckman because she "is poor and cannot remember" (Tr. 396). Plaintiff described ongoing hip pain, although she conceded that she did not exercise and did not perform any other treatments to control her pain (Tr. 396). She also reported ongoing anxiety, but stated that she had not gone to counseling (Tr. 396). Ms. Heckman found Plaintiff in no acute distress, her lungs were clear to auscultation, she exhibited normal range of motion in her extremities with no motor or sensory deficits, and her cranial nerves were intact (Tr. 397). Plaintiff also denied suicidal ideation, and Ms. Heckman found her affect normal (Tr. 397).

On September 20, 2011, state agency physician W. Jerry McCloud, M.D. reviewed the medical record, and opined that Plaintiff retained the residual functional capacity (RFC) to occasionally lift and carry twenty pounds; frequently lift and carry ten pounds; and stand/walk, and

sit, for about six hours in an eight-hour workday; and she could occasionally climb ladders, ropes, or scaffolds, and frequently kneel, crouch, crawl, and climb ramps and stairs (Tr. 78-79).  Dr. McCloud further opined that Plaintiff did not experience, among other things, any environmental limitations (Tr. 79).

Several days after Dr. McCloud's assessment, Dr. Das indicated, in a questionnaire to the state agency, that Plaintiff's impairment imposed no limitations on her ability to perform sustained work activity (Tr. 93, 391).

Three months later, Plaintiff returned to Ms. Heckman and described an onset of cold symptoms, including a hacking, non-productive cough, about three days prior thereto (Tr. 399). Plaintiff stated that she still had not completed the "health fair labs" Ms. Heckman had referenced nine months prior, and she also had not sought psychiatric treatment (Tr. 399).  Ms. Heckman found Plaintiff's lungs clear to auscultation, and Plaintiff was experiencing no joint deformities or abnormalities, with normal range of motion in her extremities for her age, and no motor or sensory deficits (Tr. 400).  Several weeks later, Plaintiff underwent a CT scan of her sinuses, which revealed evidence of acute and chronic paranasal sinus disease, but no major septal deviation (Tr. 414).

In November 2011, Plaintiff went to the Galion Community Hospital Emergency Room, complaining of an ongoing productive cough (Tr. 404).  Plaintiff admitted that she continued to smoke cigarettes, and her attending provider found her lungs coarse with rhonchi, diminished breath sounds, and wheezes (Tr. 404-405).  An x-ray of Plaintiff's chest revealed no acute cardiopulmonary findings (Tr. 413).  On physical examination, Plaintiff exhibited good movement of her extremities and major joints (Tr. 405).  Plaintiff's care provider found no medical emergency, but diagnosed her with chronic bronchitis and COPD (Tr. 405-406).  When Plaintiff returned to Ms. Heckman several days later, her breathing had improved (Tr. 401).  Ms. Heckman found her lungs clear to auscultation (Tr.

7

402).  Plaintiff also reported rectal bleeding, and noted that she previously had been diagnosed with hemorrhoids and colitis (Tr. 401).

Two weeks later, Plaintiff returned to Ms. Heckman, complaining of white patches on her tongue (Tr. 587).  The following week, Plaintiff continued to exhibit a productive cough, and Ms. Heckman mentioned her COPD diagnosis (Tr. 427).  Ms. Heckman also found bilateral crackles on chest auscultation, and Plaintiff denied anxiety or depression, and she exhibited normal range of motion in her extremities and no abnormalities in her back or spine (Tr. 428).

On January 5, 2012, state agency psychiatrist Patricia Semmelman, Ph.D. reviewed the medical record, and opined that Plaintiff exhibited a mild restriction in her activities of daily living, with moderate difficulties in maintaining social functioning, concentration, persistence, or pace (Tr. 94).  Dr. Semmelman further affirmed the prior assessment by Dr. Seleshi of Plaintiff's functional abilities (Tr. 100).

The following month, Leon D. Hughes, M.D. reviewed the medical record, and opined that Plaintiff retained the physical RFC to occasionally lift and carry twenty pounds, frequently lift and carry ten pounds, and stand/walk, and sit, each for about six hours in an eight-hour workday; she could occasionally climb ladders, ropes, or scaffolds; she could frequently kneel, crouch, crawl, and climb ramps and stairs; and she should avoid even moderate exposure to fumes, odors, dusts, gases, and poor ventilation (Tr. 96-97).

In March 2012, Plaintiff complained to Ms. Heckman of back pain, stating that she was using her medications as directed (Tr. 588).  Plaintiff also cited her continuing cough, as well as ongoing GERD symptoms (Tr. 588).  Ms. Heckman found Plaintiff's chest symmetric with bilateral wheezing found on auscultation (Tr. 589).  Plaintiff continued to exhibit no motor or sensory deficits with intact cranial nerves and normal range of motion in her extremities (Tr. 590).

8

On July 12, 2012, Plaintiff complained to Anthony McEldowney, M.D. of arthritic pain in her hands, causing difficulty with gripping and grabbing, and ongoing abdominal pain (Tr. 594-595). Dr. McEldowney found that Plaintiff could ambulate without the use of an external aid and with no significant gait abnormality; she also could move on and off of the examination table with difficulty (Tr. 596). Dr. McEldowney found full overhead range of motion in her shoulders, with mild weakness, as well as full range of motion in her wrists and elbows (Tr. 597). Dr. McEldowney opined that Plaintiff exhibited weakness in her gripping and pinching abilities, and he noted that she had no upper or lower extremity sensory or reflex deficits (Tr. 597-598). Dr. McEldowney opined that Plaintiff exhibited severe limitations regarding sitting, standing, walking, bending, stooping, lifting, carrying, pushing, pulling, traveling, and being around heights or heavy machinery (Tr. 599). He also described her as having difficulty with overhead activities, and stated that she should avoid repetitive activities involving her upper or lower extremities (Tr. 599). Dr. McEldowney concluded that, "In my opinion, the claimant is permanently and totally disabled for all types of employment" (Tr. 599).

On the same date, Dr. McEldowney completed a medical source statement of ability to do work-related activities (Tr. 600). Dr. McEldowney opined that Plaintiff could lift and carry no more than ten pounds; could stand or walk no more than two hours; could sit for no more than six hours; and could never climb, balance, kneel, crouch, crawl, or stoop (Tr. 601). He further opined that Plaintiff could only occasionally perform reaching activities, although her handling, fingering, and feeling abilities were unlimited (Tr. 602). Dr. McEldowney further opined that Plaintiff had certain environmental limitations, including limited abilities to be exposed to temperature extremes, dust, vibration, humidity/wetness, hazards, fumes, odors, chemicals, and gases (Tr. 603). Dr. McEldowney listed certain impairments: chronic pain syndrome, anxiety, depression, and status post-motor vehicle accident with a head injury (Tr. 602).

## IV.   **SUMMARY OF TESTIMONY**

Plaintiff testified at the hearing held August 30, 2012.  At that time, she was fifty-one years old (Tr. 37).  She testified that she was married, but had been separated from her husband for over ten years.  She lives with her son in his basement.  *Id.*  She last worked at a drug and alcohol rehabilitation facility for minors (Tr. 42).  She was fired from that job because a young man under her care left the facility, and she failed to apprehend him. *Id.*  She attempted to apprehend him, but "could not get to him." *Id.*  Her job required her to be able to physically break up fights between teenagers, she was unarmed, and she often lacked the physical ability to intervene in such fights.  She attempted to maintain a good rapport with the youths under her care, to minimize such occurrences. *Id.*

Plaintiff further testified that she was involved in a motor vehicle accident when she was a teenager.  That accident caused several broken bones (Tr. 48).  She had a rod put in her right leg that ran from her hip to her knee. *Id.*  The rod was later removed. *Id.*  She has constant pain in both hips, but worse on the right.  The pain runs into her legs, down to her ankles. *Id.*  The pain is constant, but it is of greater intensity when she walks and when she lies in one position very long (Tr. 49).  The pain in her hips is at a constant level of 5 on a scale of 1-10 (Tr. 54).  The pain in her hips goes up to a 7 on the same scale at times. *Id.*  The pain is worse in the mornings, and if she has been walking. *Id.* Her sleep is disturbed several times a night by pain in her hips. *Id.*  She takes pain medication, but it takes time to start working, and only helps three or four hours at a time. *Id.*

After the accident, she had screws put in her right ankle, and those have since been removed (Tr. 49).  She testified that her right ankle is always swollen, and she often has pain in it. *Id.*  She still has a metal plate and six screws in her left ankle.  She has pain in the left ankle, as well as the right, but the pain in the right is worse (Tr. 50).  She has a driver's license, but she does not drive much

10

because using the gas and brake pedals hurts her ankles (Tr. 38).

Plaintiff testified that she also experienced a head injury in the motor vehicle accident when she was a teenager (Tr. 51).  Many bones in her face were broken and had to be put in place. *Id.*  She has since had three additional surgeries to remove scar tissue that causes her to have severe sinus problems (Tr. 51-55).  Her physician has said she needs a fourth surgery, but she has no way to pay for it (Tr. 50-51).  She often experiences numbness in her head (Tr. 51). The numbness starts at a scar over her right eye and goes toward the top of her head. *Id.*  She also has headaches, sometimes three or four in a week (Tr. 55).  She testified that lying on her left side helps to take the pressure off the right side of her head where most of the past damage was done, and where she currently has the most pain. *Id.*

Plaintiff has pain in both her thumbs, but the right one is worse than the left (Tr. 51).  The pain runs from the top of her thumb into the finger next to the thumb (Tr. 52).  Her hands often swell, and she has a hard time opening her medication. *Id.*  She can no longer sew, like she once enjoyed doing. She testified that she can button her own clothing, but it is often painful. *Id.*

Plaintiff has been diagnosed with COPD (Tr. 53).  She testified she has been prescribed Symbicort, and she takes it when she can get it, but it is very expensive. *Id.*  She also has a Ventolin inhaler and a nebulizer with two different medications that she uses to help her COPD. *Id.*

Plaintiff testified she is taking medication for depression (Tr. 55). She testified it is hard to be incapable of things she could once do.  She also testified she gets anxiety attacks when she is around very many people, and that she has problems with social interaction (Tr. 56).

Finally, she testified she could stand eight to fifteen minutes, can sit for thirty minutes to an hour, but her hips would bother her.  She can walk half a block, depending on her breathing (Tr. 57). She testified she has to use both hands to lift a gallon of milk, because she does not have the strength

in her hands she once had.  The strength in her right hand is especially diminished. *Id.*

Thereafter, the ALJ asked the vocational expert (VE) to consider a hypothetical individual with Plaintiff's vocational profile who could perform light work with frequent kneeling, crouching, crawling, and climbing of ramps or stairs; could only occasionally climb ladders, ropes, or scaffolds; could perform frequent bilateral handling or fingering; must avoid even moderate exposure to irritants, including fumes, odors, dusts, gases, and poorly ventilated areas; could accommodate only occasional changes in work setting with no production rate or pace; and could only occasionally interact with the public, coworkers, or supervisors (Tr. 62-63).  The VE testified that such a hypothetical individual could perform the representative jobs of an office helper or garment sorter (Tr. 64).

## V.    STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to disability insurance benefits.  These steps are:

1.    An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (Sections 20 C.F.R. 404.1520(b) and 416.920(b) (1992);

2.    An individual who does not have a "severe impairment" will not be found to be "disabled" (Sections 20 C.F.R. 404.1520(c)and 416.920(c)(1992);

3.    If an individual is not working and is suffering from a severe impairment  which meets the duration requirement, *see* Sections 20 C.F.R. 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in Sections20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (Sections 20 C.F.R. 404.1520(d)  and 416.920(d) (1992);

4.    If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (Sections 20

C.F.R. 404.1520(e) and 416.920(e) (1992);

5.      If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (Sections 20 C.F.R. 404.1520(f) and 416.920(f) (1992).

*Hogg v. Sullivan,* 987 F.2d 328, 332 (6th Cir. 1992).  The claimant has the burden of going forward with the evidence at the first four steps and the Commissioner has the burden at Step Five to show that alternate jobs in the economy are available to the claimant, considering her age, education, past work experience and residual functional capacity.  *See, Moon v. Sullivan,* 923 F.2d 1175, 1181 (6th Cir. 1990).

## VI.     STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability.  This Court's review of such a determination is limited in scope by Section 205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. Section 405(g).  Therefore, this Court is limited to determining whether substantial evidence supports the Commissioner's findings and whether the Commissioner applied the correct legal standards.  *See, Abbott v. Sullivan,* 905 F.2d 918, 922 (6th Cir. 1990).  The Court cannot reverse the ALJ's decision, even if substantial evidence exists in the record that would have supported an opposite conclusion, so long as substantial evidence supports the ALJ's conclusion.  *See, Walters v. Commissioner of Social Security,* 127 F.3d 525., 528 (6th Cir. 1997).  Substantial evidence is more than a scintilla of evidence, but less than a preponderance.  *See, Richardson v. Perales,* 402 U.S. 389, 401 (1971).  It is evidence that a reasonable mind would accept as adequate to support the challenged conclusion.  *See, id., Walters,* 127 F.3d 525, 532 (6th Cir. 1997).  Substantiality is based upon the record taken as a whole.

13

*See, Houston v. Secretary of Health and Human Servs.,* 736 F.2d 365 (6th Cir. 1984).


**VII.**   **ANALYSIS**

Plaintiff asserts two issues:

A.   First, the ALJ did not base his findings of severe physical impairments or physical residual functional capacity (RFC) on substantial evidence.

B.   Second, the opinion as to mental residual functional capacity is supported by the medical evidence and should have been entitled to deference by the ALJ.

In this case, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her AOD (Tr. 14, Finding No. 2).  The ALJ concluded that Plaintiff's arthritis, COPD, major depressive disorder, and generalized anxiety disorder were severe impairments, but they did not meet or medically equal the requirements of any listed impairment (Tr. 14-16, Findings Nos. 3, 4).  The ALJ also found that Plaintiff retained the RFC to perform a range of light work consistent with his hypothetical question to the VE (Tr. 17, Finding No. 5).  Furthermore, the ALJ found that Plaintiff could perform the representative jobs the VE identified (Tr. 23-24, Finding No. 10).  Therefore, the ALJ concluded that Plaintiff was not disabled under the Act (Tr. 24, Finding No. 11).

The ACT defines disability in terms of the effect a physical or mental impairment has on a claimant's ability to function in the workplace.  *See, Heckler v. Campbell*, 461 U.S. 458, 460 (1983). To be entitled to benefits, Plaintiff bore the burden of proving not only that she had medically determinable impairments, but that they were so severe that they prevented her from engaging in any substantial gainful activity in the national economy. *Id.; see, Barnhart v. Walton*, 535 U.S. 212, 222-24 (2002).  The ALJ acknowledged that Plaintiff had certain severe mental and physical impairments that limited her ability to perform basic work activities (Tr. 14).  However, the record taken as a whole, including the objective medical evidence, failed to prove that Plaintiff's condition caused work-related disabilities (Tr. 14-20).  *See,* 20 C.F.R. Section 404.1529(c).

14

The determination of disability is reserved for the Commissioner, and not a particular medical source.  20 C.F.R. Section 404.1527(d)(1).  In performing these evaluations, an ALJ must give each opinion the weight he deems appropriate, based on factors such as whether a physician examined or treated the claimant, whether the opinion is supported by medical signs and laboratory findings, and whether the opinion is consistent with the physician's records of treatment, and with the record as a whole.  20 C.F.R. Section 404.1527(c).

In evaluating the medical opinions of record in order to reach his decision, the ALJ correctly assigned to each opinion the weight he deemed appropriate, based on factors such as whether the opinion was supported by medical signs and laboratory findings, and whether the opinion was consistent with the physician's records of treatment, and with the record as a whole.  *See,* 20 C.F.R. Section 404.1527(c).

Plaintiff argues that the ALJ's determination regarding her physical RFC did not appropriately account for the findings of Dr. Hall (Pl.'s Br. at 11).  As Plaintiff notes, Dr. Hall opined that Plaintiff should be limited to light work, but that she "may have difficulty" walking more than three hundred feet, standing for more than a half hour, or sitting for more than one hour at a time; while her handling of objects was normal, and her hearing, speaking, and vision were unaffected (Tr. 380).  Based upon substantial evidence, the ALJ correctly found the walking, standing, and sitting limitations described by Dr. Hall were not supported by the evidence in the record, including the objective medical evidence, the medical opinion evidence, and Plaintiff's activities of daily living (Tr. 21).

Several months prior to Plaintiff's AOD, x-rays of Plaintiff's pelvis, hips, and sacroiliac joints revealed no acute processes or abnormalities (Tr. 442-444).  X-rays in August 2011 also showed no acute or suspicious abnormality in Plaintiff's left lower leg or hip joint (Tr. 371, 373).  Later that month, Ms. Heckman found normal range of motion in Plaintiff's extremities with no motor or sensory deficits, and her cranial nerves were intact (Tr. 397).  In December 2011, January 2012, and March

15

2012, Plaintiff exhibited the same findings: normal range of motion in her extremities, no motor or sensory deficits, and intact cranial nerves (Tr. 400, 428, 589-590).

Also, Dr. Hall's opinion evidence was undermined by the walking, standing, and sitting limitations that he described (Tr. 380). In addition, Ms. Heckman wrote a letter, stating that Plaintiff could work eight-hour shifts, an opinion with which Plaintiff agreed, since she was requesting from "Dr. Kerry" another copy of the letter containing this recommendation (Tr. 41, 567). The following year, Dr. McCloud, a state agency consultative expert, reviewed the medical record, and opined that Plaintiff retained the RFC to occasionally lift and carry twenty pounds; frequently lift and carry ten pounds; and stand/walk, and sit, for about six hours in an eight-hour workday; and she could occasionally climb ladders, ropes, or scaffolds, and frequently kneel, crouch, crawl, and climb ramps and stairs (Tr. 78-79). Thereafter, Dr. Hughes reviewed the record, and also opined as to the same functional limitations, adding that Plaintiff should avoid even moderate exposure to fumes, odors, dusts, gases, and poor ventilation (Tr. 96-97). Dr. Das opined that Plaintiff experienced no functional limitations as the result of her impairments; however, the ALJ accorded this opinion very little weight (Tr. 22, 93, 391).

Plaintiff's activities of daily living undermined the limitations described by Dr. Hall. Plaintiff received unemployment benefits during the relevant period, and, in so doing, certified that she was capable of working and was looking for work (Tr. 39-40, 567). During the relevant period, Plaintiff also drove, cooked, read, gardened, prepared meals, shopped, and did household chores (including sweeping, vacuuming, and cleaning dishes and laundry) (Tr. 38, 209-210, 367). Plaintiff also cared for her two young grandchildren for several hours each day (Tr. 208, 211). She also admitted to Ms. Heckman that did not exercise, and that, notwithstanding her respiratory symptoms and COPD diagnosis, she continued to smoke cigarettes through and including the time of the administrative hearing (Tr. 58, 396).

Furthermore, Dr. Hall's own findings did not support the extreme walking, standing, and sitting limitations he described (Tr. 380).  While Dr. Hall found diminished range of motion in Plaintiff's dorsolumbar spine and knees, her cervical spine was non-tender, with a normal range of motion and no evidence of nerve root damage (Tr. 378, 380).  Plaintiff's hips and shoulders also exhibited a normal range of motion (Tr. 378-379).  Although Plaintiff experienced diminished range of motion in her knees and she walked with an antalgic gait, she could ambulate without assistance (Tr. 378).  Plaintiff also had 5/5 muscle strength in her upper and lower extremities, with no evidence of atrophy, and no motor, sensory, or reflex abnormalities in her upper extremities (Tr. 379-380).  These findings did not support limiting Plaintiff to no more than one hour of sitting, one half-hour of standing, or a maximum walking range of three hundred feet (Tr. 380).  Nevertheless, the ALJ accorded some weight to Dr. Hall's assessment, however, substantial evidence did not support the walking, standing, and sitting limitations that Dr. Hall described (Tr. 21).

In addition, Dr. McEldowney stated that, "In my opinion, the claimant is permanently and totally disabled for all types of employment" (Tr. 599).  He also opined that Plaintiff had an extreme set of functional limitations, including that she could lift and carry no more than ten pounds; could stand or walk no more than two hours; could sit for no more than six hours; could occasionally reach; could never climb, balance, kneel, crouch, crawl, or stoop; and had only a limited capacity for exposure to temperature extremes, dust, vibration, humidity/wetness, hazards, fumes, odors, chemicals, and gases (Tr. 600-603).  These limitations were not supported by his own examination findings: Dr. McEldowney concluded that Plaintiff could ambulate without the use of an external aid and with no significant gait abnormality (Tr. 596), but the limited her to no more than two hours of standing or walking (Tr. 600).  He also found mild tenderness in her lumbar spine, with mild-to-moderate tenderness in her cervical spine, and full range of motion overhead in both shoulders (Tr. 596).  Straight-leg test results were negative (Tr. 596).  His examination of Plaintiff's pelvis revealed

stability without deformity, and she had normal range of motion in both knees (Tr. 597). The ALJ correctly concluded (Tr. 22) that these findings and observations did not support the limitations Dr. McEldowney described (Tr. 601-603). The rest of the evidence – including Ms. Heckman's findings just a few months earlier that Plaintiff had no motor or sensory deficits, and full range of motion in all extremities – also did not support these restrictions (Tr. 589-590).

Furthermore, Plaintiff contends that the ALJ did not account for certain manipulative limitations when restricting her to frequent bilateral handling and fingering (Tr. 17, Pl.'s Br. at 12, 14-15). However, the ALJ accounted for all established limitations of record in concluding that no medical provider indicated that Plaintiff experienced more extensive restrictions. Several months before the ALJ hearing, Ms. Heckman found Plaintiff's musculature normal, with no joint deformities or abnormalities; normal range of motion, and no edema, cyanosis or clubbing in her extremities; and no motor or sensory deficits (Tr. 589-590). Drs. McCloud and Hughes both opined that Plaintiff had no manipulative limitations (Tr. 79, 97). Dr. Hall and Dr. McEldowney did not find more extensive manipulative limitations than those described by the ALJ (Tr. 380, 602). Dr. McEldowney concluded that Plaintiff's handling, fingering, and feeling were unlimited, but, thereafter, limited her to no more than frequent handling, fingering, and feeling (Tr. 602). The ALJ's RFC limitation took into consideration such limitations (Tr. 17).

In conclusion, the ALJ correctly accounted for all of Plaintiff's established limitations, and, therefore, substantial evidence supports his determination of Plaintiff's physical RFC (Tr. 17).

Next, Plaintiff argues that the ALJ failed to incorporate certain mental limitations in assessing her RFC (Tr. 17, Pl.'s Br. at 15-17). During the relevant period, Plaintiff did not attend or seek therapy or regular psychiatric treatment, and she never was hospitalized for her reported psychiatric symptoms (Tr. 363, 368, 396). Plaintiff received anti-anxiety medication on an outpatient basis, and, on August 30, 2011, Ms. Heckman found Plaintiff's affect normal, and Plaintiff reported no suicidal

18

ideation (Tr. 397).  Ms. Heckman later found Plaintiff alert and oriented, with no unusual anxiety or evidence of depression (Tr. 402, 428, 590).  Dr. McIntire found Plaintiff's ability to cope with supervisors and coworkers her "area of greatest difficulty," and also opined that she experienced at least a mildly-impaired ability to cope with the typical stresses of everyday work life (Tr. 369).  Dr. McIntire also assigned Plaintiff a GAF score of 53, indicating moderate psychiatric symptoms (Tr. 368).  Dr. Seleshi determined that Plaintiff experienced a mild restriction in her activities of daily living, with moderate difficulties in maintaining social functioning, concentration, persistence, or pace; and concluded that Plaintiff could function in a stable work environment with predictable routines and procedures, and changes explained in advance (Tr. 76, 81).  Dr. Semmelman reviewed the record, and affirmed Dr. Seleshi's assessment (Tr. 100).  Based upon substantial evidence, the ALJ accounted for these limitations in limiting her to perform jobs with only occasional changes in the work setting and no production rate or pace work, and with no more than occasional interaction with the public, coworkers, and supervisors (Tr. 17).

Nevertheless, Plaintiff argues that the ALJ "ignored" Dr. Seleshi's statements limiting Plaintiff to "brief, intermittent, and superficial" interactions with others (Tr. 80, 100, Pl.'s Br. at 16).  The ALJ did not ignore these limitations when he discussed in his opinion his reasons for not incorporating these limitations (Tr. 22).  In the ALJ finding Plaintiff's capacity for no more than occasional interaction with the public, coworkers, and supervisors, he gave Plaintiff the benefit of the doubt, despite Plaintiff's psychiatric treatment records and Plaintiff's activities of daily living, which included caring for young children, routinely going outside, shopping, eating meals at restaurants, attending sporting events, and answering the door and telephone (Tr. 80, 210-211, 213, 280, 365).

As the ALJ indicated, there is no evidence in the record that Plaintiff did not interact appropriately with the medical professionals who examined her (Tr. 22).  Despite noting that her anxiety caused some problems interacting with people at work, the ALJ accommodated Plaintiff by

19

limiting her to no more than occasional social interaction.  Plaintiff also testified that she followed written instructions very well, and spoken instructions fairly well (Tr. 212).  While the issue regarding Plaintiff's capacity for social interaction was based upon her having been fired from her most recent job (Tr. 369), Plaintiff, nevertheless, stated she was fired because of an argument as to whether she could work a sixteen-hour shift, rather than an eight-hour shift (Tr. 567).  This incident does not support a finding of disabling mental impairments: Plaintiff actually stated that she could work an eight-hour day (Tr. 567).  The ALJ correctly concluded that the record did not support the limitations that Dr. Seleshi described (Tr. 17, 22, 80).  Hence, substantial evidence supports the ALJ's mental RFC determination (Tr. 17).

Finally, Plaintiff argues that the ALJ erred in not including Plaintiff's sinus condition or headaches among her severe impairments (Pl.'s Br. at 17).  However, the ALJ's finding of other severe impairments rendered it not necessary for him to also list these alleged conditions/symptoms among Plaintiff's severe impairments (Tr. 14).  *See,* 20 C.F.R. Sections 404.1520(c) and 404.1545(a)(2).  Once the ALJ assessed Plaintiff's RFC at step 4, the presence or absence of "severe impairments" earlier listed by the ALJ were not required (Tr. 14, 17).  In her brief, Plaintiff does not indicate any limitations that should have been included in Plaintiff's RFC if the ALJ included these impairments among her severe impairments (Pl.'s Br. at 17).  Hence, Plaintiff, who has the burden of proof, has not shown that the alleged error was harmful.

One and one-half years before her AOD, Plaintiff underwent a nasal/sinus endoscopy, associated findings which suggested chronic sinusitis (Tr. 300, 493); post-AOD records were also consistent with this diagnosis (Tr. 414).  Furthermore, Plaintiff worked for decades with these conditions.  Also, she continued to receive unemployment benefits and certified that she was capable of, and seeking, regular employment (Tr. 39-40, 174-175, 567).  The record does not establish disabling limitations, related to either Plaintiff's sinus condition or headaches (Tr. 17).

20

In summary, substantial evidence supports the ALJ's determination that Plaintiff is not disabled based upon the entire record.


**VIII.** **CONCLUSION**

Based upon a review of the  record and law, the undersigned affirms the ALJ's decision. Substantial evidence supports the finding of the ALJ that Plaintiff retained the residual functional capacity (RFC) to perform light work existing in significant numbers in the national economy, and, therefore, was not disabled.  Hence, she is not entitled to DIB.


Dated: July 17, 2014                                  _____*/s/George J. Limbert*_____
                                                                          GEORGE J. LIMBERT
                                                                          UNITED STATES MAGISTRATE JUDGE